## JESSE LOVE v. STATE.

No. A-10659.    Feb. 26, 1947.
(177 P. 2d 846.)

Harry C. Kirkendall, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Haskell A. Holloman, Asst. Atty. Gen., for defendant in error.

JONES, J.  This is an appeal from a conviction sustained by the defendant Jesse Love in the county court of Garfield county. ·

Two propositions are presented by the appeal, to wit: First, the officers making the search did not have a legal search warrant, and the search made thereunder was unreasonable. Second, the evidence is insufficient to sustain a conviction.

These questions are so closely related that for the purpose of disposing of them they may be considered together.

In support of the first proposition, the record discloses that prior to the trial, counsel for defendant filed a motion to suppress the evidence on the grounds that the search warrant was invalid and insufficient, and that the seizure of the whisky in question was in violation of the constitutional rights of defendant.

A hearing was held on this motion to suppress evidence at which it was shown that on December 30, 1944, Ralph Tennison, a police officer of Enid, signed two affidavits for search warrants before a justice of the peace of the city of Enid. One of these affidavits sought a warrant to search room 305 in the Youngblood Hotel located at 302 North Independence street in the city of Enid, and it alleged that the property was in possession of one Jesse Love. A warrant was issued based upon this complaint, but the testimony of the officers and the endorsement on the war-

rant shows that it was not served. Another search warrant was issued on the same date based upon the second affidavit, which described the premises to be searched as:

"Street address 302 North Independence, City of Enid, Oklahoma, being the South 3 feet of Lot Ten (10) and all of Lots 11, 12 and 13 and 16.25 feet vacated strip on the South side of Lot 13, all in block 25, Jonesville Addition to the City of Enid, Oklahoma, said premises being also described as Youngblood Hotel, including all cloak rooms, store rooms, toilet rooms, engine rooms, employees' lounge or locker rooms, and any and all other rooms used in the operation of said Youngblood Hotel and located therein, which are not rented nor occupied by hotel patrons; that said property is in the possession of the Enid Hotel Company, a Corporation."

The testimony of the officers was that the whisky involved in this prosecution was seized under authority of the warrant directed to the Youngblood Hotel above described, a copy of which was served on defendant, who according to the evidence of the officers, was the chief bell boy in charge of a locker room and cabinet where the whisky was found.

The testimony of the officers further showed that on the date in question, four policemen and a highway patrolman, armed with the two search warrants above described, went to the Youngblood Hotel in the city of Enid to conduct a search of the premises for intoxicating liquor.

Officer Tennison, the person in charge of the search and the officer to whom the warrant was directed, testified that upon entering the hotel he went directly to the check room, which was a room that the bell boys used to store their equipment such as ice trays and pitchers which they used in making service calls. Also in the room were some shelves where luggage was sometimes stored when it

was checked with the bell boys by patrons of the hotel. Also in the room was a cabinet which was locked. Shortly after the officers entered the check room, the defendant appeared. Tennison gave him a copy of the search warrant and asked defendant if he had a key to the cabinet which was in the room. The defendant stated he knew nothing about it. Whereupon the officers told defendant that if he did not produce the key, they would break the door to the cabinet. The witness further testified that when this statement was made to the defendant, he produced the key from his pocket, the cabinet was opened, and 11 quarts and eight pints of tax-paid whisky were therein found. After this whisky was found, the officer asked defendant if he had any more whisky, and defendant said "no." The officer then informed defendant that the warrant covered any place in the hotel, and that he was going to look around, and that if he had any more whisky it would probably save the management of the hotel embarrassment if he would show them where it was. That after this conversation was held, the defendant took the officers to the third floor. That he there unlocked a door to a pipe shaft and showed them eight quarts and five pints of whisky and stated that's all there was. On cross-examination, the officer testified that he told the defendant after the whisky was found in the cabinet in the locker room, that if he had any more whisky and if he did give it to the officers it would save the management as much embarrassment as possible. The other officers' testimony was substantially the same as that of Officer Tennison.

The defendant did not testify, but there was called as a witness in his behalf, one Joe Sisk, a bell boy at the Youngblood Hotel, who testified that the master keys to all the rooms in the hotel and other keys are kept on a ring hanging on a nail at the west end of the clerk's desk for

the use of the employees. On cross-examination in response to the question, "Is there a key on there that opens the little cabinet in the cloak room?" he stated, "No, sir, I have that key in my pocket." Question, "Do you know where that key was on the night of December 30, 1944?" Answer, "On this ring, so far as I know."

The ring referred to by the witness was a ring allegedly brought by the witness from the hotel, on which there were several keys. It was further brought out on cross-examination of the witness Sisk that the key to the door leading to the pipe shaft where the liquor was stored on the third floor was not kept on the key ring at the desk.

The defendant did not testify either on the motion to suppress evidence or at the trial. There was no contention made by him that he was the owner of the premises which were searched by the officers.

In Plumlee v. State, 78 Okla. Cr. 201, 146 P. 2d 139, it is held:

"Constitutional provision guaranteeing one immunity from unlawful search and seizure is personal, and one accused will not be heard to object that the search of the property or premises of some third person is a violation of his constitutional rights."

The case of Freeman v. State, 72 Okla. Cr. 137, 113 P. 2d 843, 844, is very similar to the one in controversy. In the body of the opinion it is stated:

"The proof showed that three state officers went to a justice of the peace at Lawton and procured two search warrants, one of the search warrants describing the home and premises of the defendant, Joe Freeman, and the other describing the house and two lots adjoining the home of the defendant, Joe Freeman. The owner of these premises was given as John Doe. * * *

"The state officers took the two warrants and, without consulting any of the local officers, went first to the home of Joe Freeman and searched it without finding any liquors. The house adjacent to Freeman's was locked and unoccupied at that time. With reference to this place, Officer Walsh testified:

" 'A. Previous I had asked Mr. Freeman who was living in this place, he told me that a man working on some job rented the place in the winter time and went on the road in the summer time. I asked if he had the keys, he said, 'No.' All of the gates were locked, fastened up with ropes, excepting the gate leading from Freeman's home leading to the back door of this house. This is directly north of his residence, which had a lock on the gate and on the back door. He finally gave us two keys to the place. We found that they were not the proper keys. Mr. Finley made Freeman produce the proper keys, telling him we were going to break in the place, that he might as well give us the keys anyway.   Q. He gave you the keys then?   A. Yes, he did.   Q. What, if anything, did you find?   A. We found a quantity of whisky, wine, and gin.   Q. How much, if you recall?   A. In a rough count, there was some place around 1,200, 1,400, maybe 1,600 bottles. I would say over 1,200 bottles.'

"It is not necessary to discuss the question raised by the defendant, as this proof shows that the defendant did not claim the ownership or possession of the house where the liquors were found. The defendant did not testify either on the motion to suppress the evidence or in the trial; but in his statement to the officers, he denied any ownership or possession of the house where the liquor was found.

"This court has many times held that the constitutional provision guaranteeing one immunity from unlawful search and seizure is personal to the occupant of the premises involved; and one accused of crime will not be heard to object that a search is unlawful where the accused denies that he owns or has possession of the property or premises searched. Tacker v. State, 72 Okla. Cr. 72, 113 P.

2d 394; Rogers v. State, 72 Okla. Cr. 123, 113 P. 2d 606; Chanosky v. State, 52 Okla. 476, 153 P. 131; Hall v. State, 39 Okla. Cr. 254, 264 P. 221, 222.

"In this case the house where the liquor was found is not the home or within the curtilage of defendant's home, as it is on an entirely different lot and enclosed by fence. The defendant stated that it was being rented by a man who was away for the summer; but defendant produced the keys to the house."

We think the circumstances of the defendant being present at the locker room and producing a key to the cabinet where the whisky was found after first stating he did not have a key, and then taking the officers to a hidden cache of whisky on the third floor after they asked him if he had any more whisky are sufficient to connect the defendant with the possession of the whisky in controversy and are sufficient in the absence of any proof to the contrary to sustain his conviction.

The judgment and sentence of the county court of Garfield county is affirmed.

BAREFOOT, P. J., and BRETT, J., concur.